35054 Magnet Management Corporation v. United States May it please the court, we're here today to talk about Granite's loss on sale damages, which we believe is a unique damages claim made in a Winstar case. I plan to discuss lower court errors regarding three sets of questions that this court raised on an email. Questions regarding value, questions regarding price, questions regarding transferability. Turning first to value, the trial court committed legal error in holding that $213 million of supervisory capital available in 1994 would have had no value to the buyer, First Madison. The court's fundamental error was in holding that supervisory capital was thin air and had no value except in the context of the purchase of the failing print. That statement and that conclusion is contrary to numerous decisions that this court has made, which upheld that supervisory capital had value after the time of the breach in 1989. Moreover, many of those decisions, or some of those decisions, have been in circumstances where the thrifts were healthy thrifts, such as in home savings and was sale. How did the court come to this error? How did the court make this error? The court made this error in reaching the conclusion that capital had no cost. That decision and that determination was clearly contrary to determinations of this court holding that tangible capital has a cost. That cost being the cost being the returns for that tangible capital. And that holding is in home savings, LaSalle, and other cases of this court. In essence, what this court has held, that the value of supervisory capital is in lowering the capital requirements and enabling the thrift to substitute low-cost deposits for high-cost tangible capital. That's literally what the home savings court says, what this court said in home savings. The trial court in footnote 35 attempts to distinguish home savings and LaSalle, claiming that while capital may have a cost in replacement circumstances, it doesn't have a cost in this situation. That is the granted situation. First, the trial court's pronouncement is inconsistent with many decisions of this court upholding damages in connection with the 1989 breach, other than in replacement circumstances. Mr. Kroll, I have a major problem aside from valuation. Transferability. When you get to that issue, if you can't transfer, then the whole issue of valuation doesn't matter. I agree with that, Your Honor. If it can't be sold, then it has no value in connection with the sale. Absolutely agree with that. First thing to understand with respect to transferability is that the trial court correctly held that it was a contract right. So, in essence, what was available in 1994 was a right to use the remaining $214 million of supervisory capital up until it ran out in 2011. The net effect of that is saying, look, when you buy it, if it was first match, when you buy it, you get the contractual benefit of lowering your capital requirements. That is what was being sold. That doesn't get affected by GAAP, and that's a saleable contract, right? So what did the trial court do wrong? What the trial court did wrong is it said the government wouldn't approve that. Now, we have four arguments with respect to that. Let me tell you what bothers me about it, Your Honor. This so-called supervisory capital, supervisory goodwill, that's not real. This isn't really capital. This is something else. This is a device by which they were able to use what was a deficit, in effect, as part of their capital in the depreciation. And the regulators allowed this peculiar arrangement to encourage the healthy thrifts to buy the thrifts that were in bad shape, which otherwise they probably wouldn't have purchased. And my question to you is, when you've got a sale between two healthy thrifts where you don't need this crazy system of accounting in order to encourage them to acquire, why on earth would the regulators approve this? It seems to me that there's no reason to approve it when it's unnecessary. Well, Your Honor, here is the situation. First of all, understand that the assignability of that right was valuable at the time it was originally provided in connection with the supervisory concession. But it says also that they can only assign it with the approval of the regulators. Absolutely, Your Honor. Now, our first argument was following the Holland case, which said that that approval right of the government expired with respect to the termination because that was an executory provision. But moreover, understand what the trial court did in its determination. Because there's three other arguments here. What the trial court did is it essentially sought to rewrite the contract. What the contract says, the words of the contract say, we get this right, and they say it's assignable, subject to government approval. Fair enough. What the trial court said is it said, look, it can only be assigned, this right, this contract right can only be assigned in connection with the purchase in a supervisory acquisition. The contract didn't say that. You can't rewrite the contract to do it. So the next question becomes, OK, would the government have imposed that restriction with respect to the sale of supervisory capital in connection with another sale? Our view is it's simply speculation that they would have done that. The reason we can say that. They would have done that until the acquisition had been too healthy a purchase. Your Honor, the way that the government had chosen to deal with the issue, and the government regularly had the right to approve acquisitions of thrips. They did that dozens and dozens of times. And in those circumstances where there were acquisitions of thrips, there were many acquisitions pre-firea of thrips outside the context of supervisory acquisitions. That's all the data that Dr. James, Professor James. I'm talking about an acquisition that was made where the supervisory capital got created. That's a supervisory, or the initial acquisition that created, or the initial deal that created the supervisory capital is one set of transactions. That's where we got the contract rights. Another set of transactions is simply one thrift buying another thrift. That happened on a regular basis. That's the data that Professor James looked at. And in connection with those acquisitions, understand that no one was making the distinction pre-firea, or few people were making the distinction pre-firea, with respect to supervisory capital or supervisory goodwill versus regular goodwill. It wasn't necessary. It wasn't necessary. Exactly. It wasn't necessary. And what was regularly happening under those circumstances? What was regularly happening under those circumstances is the amount of goodwill after the deal was done either stayed roughly the same or it increased. That's what was happening. That was the reality. What did the government do under those circumstances? It also depended on the way the acquisition was accounted for. It depended if it was a pooling or a purchase transaction. If it was a purchase transaction, you wouldn't have any goodwill carriers. Your Honor, what would happen, though, or what happened in 37 out of 40 of those acquisitions is the amount of goodwill at the end of the day, after the acquisition was completed, either stayed roughly the same or was higher. And how did the government protect itself under those circumstances? The way the government protected itself under those circumstances was applying the safety and soundness principles, saying, look, if the entity that's buying it is safe and sound and financially viable, then we're protected. That was the principle. The government now says, let's speculate. Let's assume that they would have applied a different principle to provide that protection. And that different principle that they enunciate is saying that this would only be allowed in the context of a purchase of a failing thrift. The contract doesn't say that, and they're simply speculating or seeking to rewrite the contract to put that in. Or alternatively, what they're doing is they're breaching the contract. We have a contract. We have a right. It is assignable, says the contract, subject to approval by the government. Now the government is saying, no, your right is not assignable except in a narrow set of circumstances. It's not what the contract says. I understand. The government is saying that the evidence indicates that the regulators weren't going to approve it. Your Honor, the regulators— That is not what the Court of Federal Claims held. Well, our view of reading the Court of Federal Claims is it said the regulators would have essentially rewritten the contract to say it could only be transferred in connection with the acquisition of a failing thrift. Let me make another point here. The other point is to say, look, what happens in the context of this acquisition by First Madison? What would happen? Whatever supervisory capital you had before—and we have. In 1994, FNB, Ford, that set of entities has supervisory capital, has supervisory goodwill and capital credits. When the acquisition takes place, there isn't more of it. Because it's a contract, right? There's the same amount of it. How would you then say, are we worse off or better off as a result of that? How would you determine that? You would determine that by looking at the financial wherewithal of the buyer. The safety and soundness of the buyer. If the buyer was safe and sound, if the buyer were a safe institution, then there would be no increase in risk because there's no change with respect to the amount of the supervisory goodwill and capital credits. It's still there. And you would focus on the wherewithal of the buyer. How would GAAP require you to account for that acquisition? The way GAAP would work under that circumstance is—all the experts agree—is that GAAP does not trump contract rights. So if you have a contract right, GAAP isn't going to force you to rewrite it. But what is the contract right to assign it with the approval of the regulators? It's not the contract right— To assign it with the approval—yes, that's the contract right, if you assume that they still have the right of approval. But they're literally saying, you can't assign it. You can assign it with the approval of the regulators, but the regulators will not approve except in this set of circumstances that's going to have no application. That is not an assignment. If I sign a contract that says I can assign something, but the person I sign that contract says it's subject to approval, it can't be that they won't approve the assignment in an acquisition. That's a breach of contract, or they've effectively rewritten the contract to prevent me from assigning my contractual rights as provided for in that particular contract. Aside from the assignability, hypothetically, the purchase method type of employment on the GAAP, what would happen to supervisor approval? What would happen would be that the contract right would be provided because— You're forgetting about the contract right. How would you account for it? It would be revalued at the time of—it could be valued as an intangible asset, identifiable intangible asset on the balance sheet of the subsequent acquirer. But the contract right, the right to use the $214 million of supervisory capital through 2011, that contract right, that contract with the government would continue forward. It would be set out as an identifiable intangible asset. So the contract would still be in effect at that point? The contract would still be in effect. So it's not terminated? It's not terminated. And all the experts agree that accounting does not trump contracts. That would not be the issue. That wasn't what the judge decided. His issue was this issue of approval. And as we said, first, there would be no right because it would have expired. They're rewriting the contract. It would be a breach, and they're speculating— Thank you, Your Honor. May it please the Court. The trial court made three specific factional judgments. Each and every one of them is overwhelmingly supported by the evidence. Any one of them is sufficient to dispose of Granik's claim. This court reverted the case to give Granik, quote, the opportunity to offer evidence if it can produce on the various issues of transferability, value, and price. Granik did not present a single witness to testify that they ever bought supervisory goodwill or sold supervisory goodwill. It didn't present a single witness from the actual acquirer, 94%, that they were interested in supervisory goodwill and they would have paid even $1 for it. It didn't provide any evidence from any potential acquirer in 1994 to say that they would have been interested in supervisory goodwill. Your Honor, this court and the trial court used the term supervisory goodwill, but they meant the same thing. Yes, Your Honor. Yes, Your Honor. Correct, Your Honor. Goodwill, even before Piray, counted towards meeting the capital at once. Yes, sir. It still doesn't become goodwill. I understood, Your Honor, but regardless, and our argument is not based on the name you give to it. Regardless, let's call it supervisory capital. There was simply no one who testified that they would have been willing to pay any money for supervisory capital. Regardless, whatever name you use, nobody testified that they would have paid anything for that. So, your point is that the regulators refused or the regulators testified that they wouldn't have approved it. You don't get to that because no one's going to buy it anyway. They would have to insist on being dropped. Well, that's certainly one reason, Your Honor, that nobody testified that they would pay cash for supervisory capital. So, does that not make the regulators, the evidence on what the regulators would do? Absolutely. The court's findings on value, transferability, and price, any one of them, is sufficient to dispose of Grant and Piray. But to focus on the transferability issue, this court asked a specific historical question. Have there been any sales of thrifts that included such goodwill? Sometimes everybody talks about buying someone's supervisory goodwill. The question seems to me to be somewhat different. The question is whether they would have paid more for First Nationwide if it had included the supervisory goodwill. No one is going around saying anyone ought to buy some supervisory goodwill. The question is whether if they included that, they would have a package that was more valuable and for which people would pay more. Absolutely. That is the question. And they did not show a single witness to say that, yes, they would have paid more if supervisory goodwill was included in the package. Not a single witness. I thought Mr. Walker did say that he could have sold the bank for more if he had had supervisory goodwill. Yes. Their expert witness did say that, Your Honor. What I'm saying is they did not show any witness from any potential acquirer to say that they would have believed Mr. Walker's calculations and they would have been willing to pay for the bank. I understand a little differently. I suppose you're saying they didn't produce any evidence as to why people would be willing to pay more for this other than some theoretical concepts. Absolutely. Not only why, but also whether they in fact would have paid more for it regardless of the reason. They did not produce such a witness, and the trial court simply didn't believe Mr. Walker's evidence. Mr. Folt said the trial court erred in holding that goodwill was thin air. The phrase thin air came from one of the potential acquirers. In fact, the runner-up in the bidding for the bank described supervisory goodwill as thin air and was urging Congress to eliminate it, even though that potential acquirer at the time had $300 billion worth of supervisory goodwill and they were still urging Congress to eliminate it because they viewed it as thin air. That's what the court was referring to in showing that there is simply no evidence that anybody would have paid anything for this item regardless of what name you ascribe to it. The courts, everybody agrees that goodwill, that prior to Farrier, the phrase supervisory goodwill was never used. It's a creature of Farrier. Prior to Farrier, it was all called goodwill, and it was all treated the same way. And the acquired goodwill on the books of an acquired company simply goes away upon acquisition, and that was admitted by their own expert. That's traditional goodwill, isn't it? That's right. That's not this good. Well, that's what the trial court exactly said. It said the fact that traditional goodwill goes away is not dispositive. Let's see if supervisory goodwill or goodwill from an assistance agreement is treated differently. And it made a factual finding that it's not. And that factual finding is based on overwhelming evidence. First, the court said, granted itself prior to Farrier, sold branches and subsidiaries that included some of this goodwill from the assistance agreement, some of this supervisory capital, if you will. And when it did so, it simply wrote off the supervisory goodwill or supervisory capital. It didn't sell it. It didn't seek permission to sell it. It simply wrote it off. And we even asked their own accountants, the real world and one of their experts in this case, he admitted that he could not recall any situation where anybody sold the right to count goodwill towards regulatory capital or the right to count capital credits towards regulatory capital. And that testimony is on A103436. And in addition to the testimony of their own witness and their own behavior, two senior regulators testified that they've never heard of such a thing. Anybody selling that item under the assistance agreement to another bank or another bank acquired it. They testified that it is inconsistent with their policies, with their procedures, and it never been done. Is that because of the accounting requirements of GAAP? Or is that because of the parties deciding not to use that as part of their transaction? It is part. It is. Well, there's many reasons for it. First of all, it's not permissible under GAAP. And the second reason is it's simply not permissible under the regulations as they apply them. Even if you use a pooling method? No, if you use a pooling method, it actually survives. The plaintiffs agreed that this transaction could not have been done as a pooling even in the new breach law. So they could not have done that. And technically, as a pooling, in a pooling, there is no purchase of anything. It's simply two companies combined to form one company. They combine the two balance sheets. And neither company buys anything from the other. Therefore, the question of pooling would not be applicable to this case. By their own admission, they could not have done it as a pooling. So the purchase method, how would you account for it? Is the goodwill eliminated completely? The goodwill of the acquired company is eliminated completely. And this is discussed on the page. You can't supervise recapture. That is what the court actually specifically found. That's what happened in all the transactions prior to FIREA. If you have goodwill in the company's books, it gets eliminated. And if the purchase price of the new acquisition is higher than the net asset value, there may be a new goodwill number. But that number has absolutely no relation or correlation to the goodwill on the existing company's books. And we asked that very question, Your Honor, of their own accountant, with reference to the very goodwill that he wrote off prior to FIREA from this acquisition. And we asked him, why was this goodwill written off? And he said, oh, that is standard accounting practice. And we asked again, so the acquired company's existing goodwill can't be transferred to the acquirer? Answer, that is true. That's quoted on pages 19 and 20 of the documents. But Mr. Friedman points out, is that regular goodwill that we speak of in the past or is it supervisory capital? Well, in this particular case, we were talking about the very goodwill that they acquired from the 86 transactions. They sold some of the assets and wrote off the goodwill that they acquired from the very transaction we're talking about. But is that supervisory goodwill or real goodwill? Well, it was supervisory goodwill. And the own accountant simply wrote it off. And we even asked with the specific question of supervisory goodwill, if he knows of an occasion where that actually is transferred. And he said he does not know of any such occasion. And the regulators testified to exactly the same thing. And the Federal Circuit found the same thing. In addition to that, Granite's own CEO in a 1994 action filed an affidavit explaining that the intangibles associated with the 1986 contracts were, quote, personal to the companies acquiring them and may not be sold to another company. That is on page 8300127 of the appendix and it's referenced on page 12 of the court's opinion. And this was the chairman and CEO of the company at the time and was speaking on its behalf. So based on all of this evidence and absolutely no contrary evidence on the other side, the court found that supervisory goodwill, just like goodwill, the actual goodwill, would not have been transferable. But even if setting aside the issue of transferability. Well, I take it that these are two different questions. One, whether the goodwill would have transferred at all. And secondly, assuming it would have been transferred, would the regulators have authorized it? Those are different questions. Absolutely. The court answered both questions saying that on page 13 of its opinion, it said plaintiff did not put forth sufficient evidence that supervisory goodwill was ever transferred. On page 10 of its opinion, the court finds that plaintiffs could not have transferred its right to use supervisory goodwill, absent the breach. And you say those are two factual findings of the evidence in court. Absolutely. Absolutely. And that only supports, in fact, it compels because there's no evidence on the other side, other than counsel just arguing that regulators would have just had to approve it. The question of whether anybody has ever transferred this item, regardless of what you call it, is a question of fact. And on that question, the court found that it's never been transferred. It's never been brought in. So that's a historical question. Now, on the question of interpreting the contract, obviously, questions of contract interpretations are questions of law. But there's no dispute that the contract explicitly says that the regulators, that nothing can be transferred, even if it is transferable ordinarily. It can't be transferred without regulatory approval. And the regulators simply said that is simply not something that they would ever agree to. It's inconsistent with all of their rules and regulations. The assignment to the right to assign if it's in the contract, that they ask the regulators, and the regulators can't just in the rule of millie say no. No. There has to be an obligation of good faith. There is an obligation of good faith. But here, as the court found, the regulators would have had a transfer in the circumstances of this case, that the court found in page 7 of its opinion, would unnecessarily increase First Medicine's risk. And the court also found that the transfer of supervisory goodwill from FNB to First Medicine would have been completely counter to the purpose of regulatory forbearance, and the regulators would have had many reasons to reject the transfer. And that's page 8 of the court's opinion. Mr. Pohl suggested it wouldn't make any difference. Of course it would. Because they're saying, according to their theory, they would pay $130 million for the goodwill. And then, according to their theory, they would take the goodwill and dividend out an amount of money equal to the goodwill transferred. So that would be extracting over a third of a billion dollars of real capital from the bank, according to their theory. That, of course, affects the risk. And the court said that that has never happened. Nobody has ever transferred an amount of cash outside of the bank to the owners of the bank, simply because they had just acquired a new supervisory goodwill or supervisory capital, or however you call it. And their own witness admitted that that's simply never been done, as far as he knows, according to the history of the world. Therefore, the models are simply totally speculative. They are totally hypothetical. And they're also inconsistent with what FNB itself said at the time of firing. They said, quote, We believe that legislation has preserved our position in the thrift business and enhanced the value of the franchise. Speaking of firing, speaking specifically about the elimination of goodwill, they said, This is consistent with our position of supporting a strong real money capital requirement in conjunction with tough enforcement for noncompliance. That's on page 830095 of the appendix. So their own claim of valuation is exactly the opposite of what they themselves said at the time. It's exactly the opposite of what a potential acquirer said. They said it's worthless, thin air, and were urging Congress to remove it even though they had $300 million of it. And they have not shown a single witness from any prospective company that says we would have paid you even one penny for this supervisory capital, supervisory goodwill, for whatever reason. Given that, the court's findings are amply supported by the evidence. Thank you. Start with two points. One, the statement that the actual acquirer said supervisory capital was thin air is simply wrong. First, Madison never made that statement. Second, Mr. Sowery said that there were regulations that prevented the transfer. No, there were no regulations. What the government relied on was speculation of two witnesses and two documents that were never provided to FNB or seen by FNB. I want to go, though, to what the trial court ruled. The trial court said on page 6 regarding supervisory capital, it said it's the ability to use this means of substituting was a contract right granted by the government and is not affected by GAAP even though it is wrapped up in accounting principles. So how would that play out with respect to the acquisition by First Madison? What First Madison says in their business plan, and the business plan is the evidence of what they intended to do, First Madison says, look, what we intend to do is we intend to meet the well-capitalized standard and then we intend to dividend out the balance of the cash that we generate from our operations. So what happens? They buy supervisory capital. Guess what? The well-capitalized standard is down by $213 million in the first year of acquisition. Then it retreats to zero by 2011. So what does First Madison get to do? What First Madison gets to do is it has $213 million of additional capital it doesn't need. It can replace that capital with lower-cost liabilities such as deposits or borrowings. And then it can dividend out that money. It has to then issue smaller dividends in the future to bring it back. And essentially what Mr. Walker's dividend model calculation is, it's the mere image of home savings. It is the mere image of home savings. He is saying, I'm substituting supervisory capital and liabilities for tangible capital, and I'm saving the institution a lot of money, which it can dividend. That's the $130 million. That's what Mr. Walker's dividend model is about. As to the issue of transferability, pre-FIREA, it simply never happened. No one distinguished between supervisory capital and regular goodwill. They didn't. All rise. The Honorable Court is adjourned until this afternoon at 2 o'clock. Thank you.